UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUNICE WELLS, et al., | ) |
|        Plaintiffs, | ) |
| v. | ) Civil Action No. 00-0760-LFO |
| ALLSTATE INSURANCE CO., *et al.*, | ) |
|        Defendants. | ) |

<u>MEMORANDUM</u>

    Plaintiff Eunice Wells brought a class action lawsuit against Allstate, alleging that Allstate violated the D.C. Consumer Protection Act when it failed to disclose to its customers that it treated claims from policyholders who are represented by counsel differently than those who are not so represented.  Plaintiff subsequently added Charles Rawlings as a party, and now seeks to name Rawlings as a representative of a sub-class of Allstate policyholders.  Currently pending is Defendants' Motion for Summary Judgment on Charles Rawlings's claims under the Consumer Protection Act.

    Despite the long and somewhat tortured history of this case, the sole issue here is whether the general release that Rawlings signed bars his claims under the D.C. Consumer Protection Act.  For reasons explained below, the release does not bar these claims, and Allstate's Motion for Summary Judgment is accordingly denied.

**I.      Background and Procedural History**

    Plaintiff Eunice Wells, an Allstate policyholder, was hit by a car crossing the street on January 2, 1998.  The driver identified himself with a fictitious name and pager number and left the scene.  She suffered a broken leg, which required hospitalization and surgery.  Accordingly, Wells sought to recover under her Allstate uninsured motorist coverage; Allstate refused to

1

settle; and Wells subsequently sued Allstate. She also moved for certification as representative of a class allegedly to have suffered from Allstate's violations of the D.C. Consumer Protection Act. Wells alleged that Allstate, inter alia, failed to disclose that it resisted paying on uninsured motorist claims, and that it adopted a "scorched earth litigation tactic" against policyholders who litigated after refusing to settle.

The case was removed to federal courts. There Wells amended her complaint to allege that, if uninsured motorist claimants were represented by counsel, Allstate referred their claims to a special unit, which, as a tactic, deliberately and regularly took far more time to pay represented claimants than it took to pay claimants who did not have counsel.

An August 12, 2002 Order certified a class of Allstate policyholders to include those who "(1) between March 20, 1997 and October 19, 2000, (2) made a claim for uninsured motorist benefits which Allstate paid in part or in full, (3) for, inter alia, bodily injury, and (4) at some or all points during the claims process were represented by counsel." Wells v. Allstate Ins. Co., 210 F.R.D. 1, 2 (D.D.C. 2002). The D.C. Circuit dismissed Defendant's appeal from the certification. See In re Allstate Ins. Co., 2002 U.S. App. LEXIS 23581 (D.C. Cir. Nov. 14, 2002). The case was subsequently referred to a Magistrate Judge for supervision of discovery, class issues, and possible settlement.

In April 2003, Wells moved to join Charles Rawlings as a party plaintiff. Rawlings was also a policyholder who settled an uninsured motorist claim with Allstate. He signed Allstate's general release agreement in exchange for a settlement payment of $22,500. A month later Wells moved to amend the class definition to include Rawlings. These motions were also referred to the Magistrate Judge.

After further proceedings related to Rawlings, in October 2004 Wells moved to qualify Rawlings as a class representative. In November 2004 Allstate moved for summary judgment on

Rawlings's claims, arguing that the general release Rawlings signed waived them. Upon referral, the Magistrate Judge issued her Report and Recommendation, suggesting that the Defendants' motion be denied. The Report was squarely based on what was purported to be the preclusive effect of this court's previous ruling on class certification. More specifically, the Report concluded that (1) there were no material facts in dispute; (2) the only remaining legal issue was whether "Rawlings' claim fails as a matter of law because he signed a general release that unambiguously discharges the claim he asserts here"; and (3) in the context of ruling on class action typicality requirements, this court had held earlier that the general release at issue "would not preclude participation in a class action premised on misrepresentation under the Consumer Protection Act, with damages based on delay in settlement . . ." See Aug. 24, 2005 Report and Recommendation, at 6-8.

In September 2005, Allstate filed objections to the Report and Recommendation, to which Wells filed a response a few days later. Allstate argued that, as previously held in the class certification opinion, "in ruling on a motion for class certification, a court does not reach the merits of plaintiff's case, but assumes allegations pled in the complaint are true." As a result, the previous holding in the class certification context was not dispositive of the issue at summary judgment. Wells's response ignored this argument. Instead Wells relied on the Magistrate Judge's conclusion that the release issue was already decided in the certification ruling.

Thus, the plaintiffs were directed in a September 15, 2005 Order to brief the merits of whether the general release precluded Rawlings's Consumer Protection Act claim. Plaintiffs, however, again failed to address the merits, and again simply reargued the contention that the legal effect of the garden variety release had already been decided. Thereafter, an October 28, 2005 Order directed plaintiffs to show cause why summary judgment should not be granted for failure to prosecute.

3

Wells's response finally addressed the merits of the issue, which sets the stage for this summary judgment ruling.

**II.     Legal Effect of Allstate's Garden-Variety Release**

    A.     Material Facts at Issue

The Magistrate Judge concluded that there were no material facts in dispute, and Allstate agreed.  See Allstate's Objections to the Magistrate's Report and Recommendation Concerning its Motion for Summary Judgment against the Claims of Charles Rawlings, at 2 n.1.  Wells maintains that there is a genuine issue of material fact as to whether Rawlings "received compensation for, and gave a release for a multitude of alleged violations of the D.C. Consumer Protection Act."  See Plaintiffs' Statement of Material Facts, at 6.  However, Wells failed to dispute any of the facts enumerated in Allstate's Statement of Material Facts, as required under the Local Rules.  See Local Civ. R. 56.1.  In addition, as the Magistrate Judge correctly concluded, Wells's "fact" is a legal, not a factual, issue.  Thus, there are no material facts at issue.

    B.     The Release

The foregoing considered, Allstate's summary judgment motion presents one legal issue: does Allstate's garden variety release, signed by Rawlings, bar his claims under the Consumer Protection Act?

The release in pertinent part states as follows:

> In consideration of the payment of Twenty Two Thousand Five Hundred dollars by Allstate, the receipt of which is hereby acknowledged, the undersigned hereby forever releases and discharges Allstate from any and all liability and from any and all contractual obligations whatsoever under the coverage designated above of Policy No. 698149830 issued to Charles Rawlings by Allstate and arising out of [x] bodily injuries, [ ] property damages sustained by Charles Rawlings due to an accident on or about the 21 day of October, 2000.

Allstate argues that this provision unconditionally releases Allstate from "any and all

liability." At oral argument, counsel for Allstate clarified that this does not literally mean "any and all liability" *in perpetuum*. Instead, this provision means that Rawlings has forever discharged any claims arising out of the accident, including, Allstate argues, the manner in which Allstate subsequently handled his claim. Moreover, even if the "any and all liability" provision applied only to the October 21, 2000 accident, Allstate maintains that this would still preclude a claim under the Consumer Protection Act.

Each of these arguments, and Wells's responses, are addressed below.

    1.    *"Any and All Liability"*

Allstate urges that the "any and all liability" phrase stands alone; the phrase beginning with "under the coverage designated above" only modifies the "any and all contractual obligations" language.

Under District of Columbia law, "[a] release is a form of contract, and the rules of contract construction govern its interpretation." GLM P'ship v. Hartford Cas. Ins. Co., 753 A.2d 995, 998 (D.C. 2000) (citation and internal quotations omitted). "Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy." Smalls v. State Farm Mutual Auto Ins. Co., 678 A.2d 32, 35 (D.C. 1996) (citations omitted). Moreover, a contract "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc., 485 A.2d 199, 205 (D.C. 1984) (citations omitted).

In this light, a fair reading of the release is that the phrase "any and all liability" is modified by the reference to the accident, and does not stand alone. First, this interpretation gives meaning to the second clause regarding contractual obligations. If "any and all liability" stood alone, then there would be no need for the remaining provisions of the release. Second, it

5

is inconceivable that Rawlings intended to waive all liability against Allstate for any claims of fraud. Rawlings did not know about the alleged fraud when he signed the release, and consequently could not have waived a fraud claim.

  2. *Release from Liability*

Even if the "any and all liability" language is modified by the reference to the accident, Allstate argues the release includes any claims under the Consumer Protection Act. Wells responds that, as a general matter, a party cannot release a claim that was unknown to him when he signed the release. In this light, Rawlings could not have waived a Consumer Protection Act claim, because he did not know that it existed.

Wells relies on <u>Wells v. Rau</u>, 393 F.2d 362 (D.C. Cir. 1968) in support. In that case, appellant Wells was involved in a car accident in May 1963. A month later, his insurer came to his house to discuss the pending claim from the accident. Wells gave him a $367.89 bill for his expenses. The insurance agent asked him if he had any injuries, and Wells replied that he bruised his knees. The agent said, "[w]ell, let's give you a hundred dollars for your knees." Wells responded that "this was fine with me." Wells then signed a general release and received a check for $467.89. <u>Id.</u> at 363.

A month after he signed the release, he developed severe pains in his neck and shoulders. A physician eventually determined that he had ruptured a disk in his neck which required an operation. The insurance company refused to pay the medical bills for this operation, and Wells filed suit. The trial court dismissed Wells's complaint, but the D.C. Circuit reversed. It held that a party who signs an insurance release in exchange for payment for one type of injury does not release a subsequently discovered injury claim. The court quoted from Corbin on Contracts: if an insurance settlement "was made in contemplation of one kind of injury, minor in character such as a flesh bruise, when in fact but unknown to the parties, there was a very different injury

such as a broken back, the settlement or release may be voidable by mistake." Id. at 364 (quoting Corbin, 6 Contracts, at 181-82 (1962)).

The logic of Rau applies equally here. The "injury" that was discovered after signing the release was due to Allstate's alleged fraud. Wells could not have reasonably known about the fraud when he signed the release. The fraud created an injury that was not known or knowable by Wells when he signed the release. On this basis, the release does not fairly cover Wells's claims under the Consumer Protection Act.

Allstate attempts to distinguish Rau on two main grounds. First, Allstate alleges that the Rau holding was factually specific and did not establish a broad rule. It quotes the court's observation that "[i]t is not a new idea that these release cases, involving as they do the invocation of the equitable powers of the court to avert injustice, are heavily affected by their own facts and do not lend themselves neatly to generalized legal rules." Allstate's Reply re Summary Judgment, at 2 (quoting Rau, 393 F.2d at 364). This discussion, however, was in the context of distinguishing another case that it had decided, which had much less favorable facts than in Rau. Moreover, to the extent that equitable decisions are fact-dependent, the perpetuation of fraud on an unsuspecting policyholder makes it a more compelling case for a court to determine that an insured made a mistake in agreeing on the release.

Allstate would also distinguish Rau on the theory that Rawlings knew about any delay in settlement, or even underpayment, when he signed the release. The appellant in Rau, in contrast, did not know about his severe injury. This analysis confuses the wrongdoing with the harm. Rawlings did not know about Allstate's alleged two-track system of processing claims when he signed the release. He may have known about the effect of the fraudulently concealed system of delay or underpayment, but did not know about the system itself, or that the delay for or underpayment of represented claimants was intentional, discriminatory, and fraudulent.

7

In addition, Allstate relies heavily on GLM P'ship v. Hartford Cas. Ins. Co., 753 A.2d 995 (D.C. 2000) to argue that a release with general language should not be interpreted narrowly and should bar any subsequent claims. In that case, GLM insured one of its buildings with Hartford. Although GLM originally carried over $842,000 in fire insurance for the building, Hartford informed GLM (through an insurance agent) that GLM was over-insuring the building, the value of which was only about $600,000. GLM agreed and reduced its fire insurance coverage to $600,000, with annual adjustments for inflation.

The building was subsequently destroyed by fire. Hartford paid GLM a total of $763,066.67, of which $674,960 was the total amount of fire insurance coverage (as adjusted for inflation). Id. at 996. As part of the settlement, GLM signed a "Sworn Statement in Proof of Loss." This statement "acknowledged that GLM agreed with Hartford as to the total amount of loss to the building, the actual cash value of the property at the time of the fire, and the amount of insurance coverage." Id. at 997. GLM also signed a statement agreeing that payment received from Hartford was "'full payment, release and discharge of all claims or demands' against Hartford 'arising from or connected with' the fire loss." Id.

Three years after the fire, GLM filed a claim for negligence against Hartford, arguing that Hartford negligently reduced coverage on the building by undervaluing the property and miscounting the square footage of the building. GLM also alleged that Hartford failed to automatically adjust the coverage for inflation for the years 1992 and 1993. Finally, "GLM claimed that Hartford negligently failed to offer GLM the option of environmental and site cleanup insurance." Id. at 997.

The district court dismissed the suit, and the court of appeals affirmed. It concluded that the general release agreement barred claims for negligence against Hartford. It held that the release "unambiguously purports to release Hartford from any claims for loss brought by GLM,

8

whether on the contract or otherwise." Id. at 998 (citation omitted).

GLM's negligence claim is readily distinguished from the case at bar. There was no allegation in GLM that Hartford willfully misrepresented any facts to GLM. Instead, GLM essentially argued that Hartford did not perform its duties with the proper degree of care. Moreover, most of the allegations underlining GLM's claims were "facts" that GLM should have known about when it signed the "Sworn Statement in Proof of Loss," including, for example, the square footage of its own building and the need for environmental cleanup insurance.

Here, in contrast, plaintiffs allege that defendants willfully concealed from policyholders Allstate's two-track system for processing claims. As defense counsel conceded at oral argument, there is no suggestion that Rawlings knew about this alleged system when he signed the release. The waiver of negligence claims in GLM is not in tension with plaintiffs' claims here.

Defendants also argue that parties to a release should be able to rely upon a waiver of liability to achieve certainty and finality. Defendants point to the statement in FDIC v. Parvizian, Inc., 944 F. Supp. 1 (D.D.C. 1996). Parvizian held that "'[i]t is fundamentally important that parties be able to rely on the explicit language of written contracts. . . . This policy applies with special forces to release, which are designed to resolve disputes out of court – not to spawn litigation.'" Id. at 4 (quoting Hershon v. Bigraltar Bldg. & Loan Ass'n, Inc., 864 F.2d 848, 853 (D.C. Cir. 1989)).

It is indeed important for parties to be able to rely on the explicit language of an agreed-upon release. An essential predicate to reaching agreement, however, is the assumption that one party has not willfully misled the other. Absent that predicate, the agreement is not enforceable by the misleading party. Plaintiffs allege that Allstate willfully misrepresented its policy concerning its treatment of claims of policyholders represented by counsel. This is not what

Parvizian contemplated or endorsed.

        3.    *Waiver of Fraud as Contrary to Public Policy*

As an additional consideration, not raised by the parties (cf. United States v. Duran, 96 F.3d 1495, 1510 (D.C. Cir. 1996); Kelso v. U.S. Dep't of State, 13 F. Supp. 2d 1, 7 (D.D.C. 1998)), from a policy perspective Rawlings could not release Allstate from "any and all liability." Courts generally do not allow parties to waive intentional torts, particularly when tainted with fraud. In Avianca, Inc. v. Corriea, 1992 U.S. Dist. LEXIS 4709 (D.D.C. 1992), the court determined that a broad, unqualified indemnity clause did not waive fraud claims. As the court explained, the "indemnity clause does not explicitly except willful conduct, yet any other reading would appear to violate common sense and what the court finds to be the intent of the parties." Id. at *32. In addition, under New York law, courts "may interpose the barrier of public policy when an exculpatory clause could be interpreted to permit fraudulent or malicious conduct." Id. at *32-33; see also Grace McLane Giesel, 15 Corbin on Contracts § 88.8 (2005) ("An agreement may contain a clause prohibiting any challenge to the bargain on the basis of fraud. Courts do not enforce such clauses."). As the Restatement (Second) on Contracts declares, a "term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy." Restatement (Second) of the Law on Contracts § 196 (1981).

The policy prohibition against broad exculpatory clauses is particularly applicable here where Allstate allegedly violated the D.C. Consumer Protection Act. That Act is meant to protect the public and deter potentially fraudulent conduct. Allowing Allstate to escape sanction for fraudulent conduct merely because of plaintiffs' failure to raise the point would undermine this goal. For this independent reason, Allstate's argument that the release exculpates it from

"any and all liability," including fraud, is unpersuasive.[1]

### III.   Conclusion

For the foregoing reasons, the accompanying Order denies Defendants' Motion for Summary Judgment as to the claims of Charles Rawlings.

/s/

Louis F. Oberdorfer
UNITED STATE DISTRICT JUDGE

Dated:  January 24, 2006

---

[1] The previous class certification opinion noted that "Allstate has a practice of requiring policyholders to sign a release form as a condition of settlement, and those releases would likely preclude claims for underpayment, as opposed to a claim for delay in payment" Wells v. Allstate Ins. Co., 210 F.R.D. 1, 11 (D.D.C. 2002).  Although there is some dispute about the exact nature of Rawlings's claims, defendants argue that they are for underpayment, and not delay.  Thus, defendants contend that the statement quoted above from the certification ruling precludes Rawlings's underpayment claims.  However, as defendants have mentioned several times, a class certification ruling necessarily does not reach the merits.  See id. at 4.  Accordingly, upon reflection and further analysis, I am persuaded that the underpayment/delay in payment distinction is not relevant to the legal consequence of the release, particularly where, as here, alleged fraud is an underlying gravamen of plaintiffs' claims.